## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**NEELIMA KATUKURI,**

          **Plaintiff,**

**v.**                        **Case No: 6:23-cv-1349-PGB-RMN**

**SECRETARY OF THE**
**DEPARTMENT OF VETERAN**
**AFFAIRS,**

          **Defendant.**

_____/

### ORDER

This cause is before the Court upon Defendant Secretary of the Department of Veteran Affairs' ("**Defendant**") Motion for Summary Judgment. (Doc. 34 (the "**Motion**")). Plaintiff Neelima Katukuri ("**Plaintiff**") filed a response (Doc. 35 (the "**Response**")) and Defendant filed a reply (Doc. 36 (the "**Reply**")). The parties also filed a joint Stipulation of Agreed Material Facts. (Doc. 33 (the "**Joint Stipulation**")). Upon consideration, the Motion is due to be granted.

## I.  BACKGROUND

Plaintiff brings this retaliatory hostile work environment action under Title VII of the Civil Rights Act. (Doc. 23). Plaintiff is a physician who began her employment by Defendant at the Orlando VA Medical Center (the "**Medical Center**") in September of 2019. (Doc. 33, ¶ 1). Initially, at the Medical Center,

Plaintiff held both general cardiology privileges ("**GC privileges**") and interventional cardiology privileges ("**IC privileges**"). (*Id.* ¶ 2).

Plaintiff has testified that, after her first few months working at the Medical Center, her supervisor, Dr. Mark Milunski ("**Milunski**")[1] and the lead interventional cardiologist, Dr. Calvin Leung ("**Leung**"), both told Plaintiff they had "received a lot of complaints from cath lab staff" about her. (Doc. 34-4, 7:30–8:2). Plaintiff asked for "data" to support the underlying complaints, but this was not provided. (*Id.* 8:5–7). Then, Plaintiff's schedule was changed so that Leung would be working during her shifts to serve as a second set of eyes on her work. (*Id.* 8:6–16). Plaintiff did not object to this arrangement. (*Id.* 8:14–16).

### A.    The First and Second Patient Events

Despite this supervision, Plaintiff admitted in hearing testimony that she committed a serious medical error during an interventional cardiology procedure on February 10, 2021, causing her patient harm. Therein, Plaintiff conceded that she crossed a patient's ("**Patient 1**") mechanical aortic valve replacement with a catheter.[2] (Doc. 34-4, 11:27–12:23). Plaintiff further agreed in deposition testimony that, as an interventional cardiologist, she was "supposed to possess the skill and knowledge and technique to avoid" such an event, which resulted in

---

[1]    According to a Declaration by Milunski (Doc. 34-12 (the "**Milunski Declaration**")), Milunski is the Chief of Cardiology at the Medical Center. (*Id.* ¶ 3).

[2]    Plaintiff candidly testified that "when this happened I was freaking out. I don't want that to happen . . . . I kind of went into a more of where, oh God, how did I do that kind of a thing." (Doc. 34-4, 12:18–22). She went on to state, "[t]his is not my intention to cross the valve" and "there is no reason for me to cross a mechanical valve, to be honest." (*Id.* 12:29–30, 13:4–5).

Patient 1 having a seizure. (Doc. 34-2, 9:18–10:12, 11:2–6, 11:17–23; Doc. 34-3, pp. 149, 157; *see also* Doc. 34-12, ¶ 5).

Then, two weeks later, on February 24, 2021, Plaintiff performed a percutaneous coronary intervention ("**PCI**")[3] on a patient ("**Patient 2**"). (Doc. 34-3, p. 183). The medical records reflect that Patient 2 had undergone a cardiac procedure in 2019 at a private hospital wherein "PCI was unable to be performed" because Patient 2's right coronary artery ("**RCA**") was "extremely tortuous and calcified." (*E.g.*, *id.* at pp. 173–74). Thus, Patient 2's providers recommended evaluation for a bypass procedure if Patient 2's cardiac symptoms persisted. (*E.g.*, *id.* at p. 172). While the parties agree that Patient 2 had declined a bypass procedure in 2019, there is a factual dispute regarding whether Patient 2 again declined the procedure at the Medical Center. (*E.g.*, Doc. 34-2, 15:7–15). Plaintiff attempted to perform a PCI on Patient 2. (Doc. 34-3, 180–84; Doc. 34-2, 14:25–15:15). The procedure failed, resulting in a dissection of Patient 2's RCA, and the patient was emergently airlifted to a private hospital for bypass surgery. (Doc. 34-3, pp. 180–82; Doc. 34-2, 15:16–16:13).

## B.    The First Suspension

The next day, on February 25, 2021, Timothy Cooke—Director for the Medical Center (the "**Director**")—issued a letter suspending Plaintiff's IC privileges (the "**First Suspension**"). (Doc. 33, ¶ 3). However, Plaintiff retained

---

[3]    During a PCI, the physician places a stent in a patient's heart after obtaining access through the patient's blood vessel. (Doc. 34-2, 7:16–24).

her GC privileges at the Medical Center. (*Id.* ¶ 25). In a Declaration (Doc. 35-15 (the "**Director Declaration**")), the Director states that the First Suspension, and all subsequent suspensions of Plaintiff's IC Privileges, were "due to incidents that triggered concerns that her clinical practice and her clinical judgment" may pose "an imminent threat to patient welfare." (*Id.* ¶ 4).

About two months later, the First Suspension was lifted. (Doc. 33, ¶ 4). However, Plaintiff then entered a Focused Professional Practice Evaluation (the "**First FPPE**"), during which her work as an interventional cardiologist was monitored by other physicians. (*See id.*; Doc. 34-2, 21:7–12). The First FPPE was for a three-month period, from April 23, 2021, to July 23, 2021. (Doc. 33, ¶ 4).

## C.    The Third Patient Event

Following the First FPPE, Plaintiff resumed her normal practice at the Medical Center. (*See id.*). About four months later, on November 19, 2021, a patient ("**Patient 3**") presented to the Medical Center for a follow up visit. (Doc. 34-3, p. 98). According to the medical records, Patient 3 was "feeling relatively well except for occasional shortness of breath with exertion," but his "defibrillator 'went off' in October." (*Id.*). Plaintiff has testified that she was aware that Patient 3 had taken Eliquis[4]—a blood thinning medication—that morning. (Doc. 34-2, 22:5–16). Plaintiff has also testified that, according to the American College of Cardiology's recommendations, Eliquis should "be withheld for at least 48 hours" before any "elective procedure." (*Id.* 74:20–24).

---

[4]    The drug Eliquis is also known as Apixaban. (Doc. 34-2, 22:24–23:1).

According to a Declaration by Leung (Doc. 34-8 (the "**Leung Declaration**")), Patient 3 was sent to the cath lab by general cardiologist Dr. Shazia Aman ("**Dr. Aman**"), who believed Patient 3 would "ultimately need a heart catheterization [("**heart cath**")][5]." (*Id.* ¶¶ 12–13). Leung states that he told Plaintiff "one of us would likely be performing this case" but that he "never instructed [Plaintiff] to proceed" with the procedure that day. (*Id.* ¶ 13). Leung further states that "[h]ad I been the one who had the case and found out the patient had been on Eliquis within 24 hours, I would not have performed the case at this time," as the patient was stable. (*Id.* ¶ 16). For her part, Plaintiff has testified that Leung told her that "Dr. Aman wants the case to be done today," and to "[g]o ahead and do it." (Doc. 34-4, 9:9–11, 9:12–13). Despite this factual dispute, both Leung and Plaintiff agree that it was Plaintiff's responsibility as the interventional cardiologist on the case to determine the appropriateness of performing a heart cath on Patient 3. (Doc. 34-8, ¶ 14; Doc. 34-2, 26:4–7).

Ultimately, Plaintiff went forward with this procedure, citing that she "was told [the] patient had multiple episodes of V-Fib and V-Tach." (Doc. 34-2, 24:15–16; 26:8–10). However, Plaintiff's Pre-Procedure Assessment Report indicates that Plaintiff's assessment of Patient 3 was for an "elective . . . procedure." (Doc. 34-3, p. 114). Plaintiff's Procedure Report for Patient 3 similarly indicates that this was an "[e]lective outpatient procedure." (*Id.* at p. 119).

---

[5]    During a heart cath, a physician injects dye into the blood vessels that feed the heart, then images the vessels to look for blockages. (Doc. 34-2, 7:9–15).

During the heart cath, Plaintiff obtained access using Patient 3's right femoral artery. (Doc. 34-2, 26:8–10). According to the Leung Declaration, with a patient on Eliquis, femoral access is associated with an increased risk of bleeding compared with a radial approach. (*See* Doc. 38-8, ¶ 11). Plaintiff testified that she had difficulty visualizing the patient's RCA and had the cath lab call Leung for help. (Doc. 34-2, 26:11–13; 27:6–13). Plaintiff scrubbed out before Leung arrived and explained where she was in the procedure. (*Id.* 28:2–17). In the Leung Declaration, Leung states that he was able to find and cannulate the RCA using Plaintiff's access site. (Doc. 34-8, ¶ 20). He then asked Plaintiff "if she was going to resume the procedure" and she responded that "she needed to leave to catch a flight." (*Id.* ¶ 21). Plaintiff has likewise testified that she left on a flight to Pheonix, Arizona that day. (Doc. 34-2, 29:6–9). While in Phoenix, Plaintiff provided interventional cardiology services at a hospital not affiliated with the Department of Veterans Affairs and did not call to check on Patient 3. (*Id.* 86:20–92:6).

In the Leung Declaration, Leung states that he stayed and completed the case, ultimately performing a PCI on Patient 3. (Doc. 34-8, ¶ 22). However, later, a blood clot formed in Patient 3's stent and the patient developed ST elevations. (*Id.* ¶ 23). Leung then performed an emergency procedure to remove the clot using a radial approach, and Patient 3 was transferred to the intensive care unit. (*Id.*). Still later, Patient 3 was found to have an internal bleed, which was located "just distal to the initial femoral access site," requiring an additional procedure. (*Id.* ¶ 24). Ultimately, Patient 3 did not improve, and the patient's family decided to

6

remove life support. (Doc. 34-3, pp. 142–43). Leung states that Patient 3 died on November 29, 2021, because of "sequelae from retroperitoneal bleed with hemorrhagic shock." (*Id.* ¶ 25).

### D.    The Second Suspension and First Complaint of Discrimination

One week later, on December 6, 2021, the Director issued a Letter summarily suspending Plaintiff's IC privileges for a second time (the "**Second Suspension**"). (Doc. 33, ¶ 5). The next day, on December 7, 2021, Plaintiff contacted an Equal Employment Opportunity ("**EEO**") counsel with the Office of Resolution Management Discovery and Inclusion ("**ORMDI**") about the suspension of her privileges (the "**First Complaint of Discrimination**"). (*Id.* ¶ 6). Therein, Plaintiff asserted that the First Suspension and Second Suspension were the result of gender discrimination. (Doc. 34-10, p. 3). Then, on January 18, 2022, Plaintiff filed a formal charge of discrimination. (Doc. 33, ¶ 7 (the "**Formal Charge**").

Roughly three and a half months after the Second Suspension began, Plaintiff was again transitioned to an FPPE (the "**Second FPPE**"), which enabled her to practice interventional cardiology with monitoring. (*Id.* ¶ 8). The Second FPPE lasted for two months, from March 24, 2022, to May 24, 2022. (*Id.*).

### F.    The Fourth, Fifth, and Sixth Patient Events

Three events of relevance occurred during the Second FPPE. The facts surrounding these events are largely undisputed. First, on April 4, 2022, Plaintiff

performed a heart cath on a patient ("**Patient 4**") who became confused, causing a "code stroke" to be called. (Doc. 34-2, 36:13–37:20). Plaintiff documented in Patient 4's medical records "COMPLICATIONS IN LAB[:] Periprocedural Stroke." (Doc. 34-3, p. 96). Therein, Plaintiff described that, while an initial CT scan was negative for stroke, an "MRI showed [s]uspected scattered tiny foci of restricted diffusion in the parietal lobes which may represent acute infarcts," also known as acute strokes. (*Id.*; Doc. 34-8, ¶ 29 n.3).

Then, on May 12, 2022, a patient ("**Patient 5**") presented to the Medical Center with chest pain and cardiac risk factors. (Doc. 34-2, pp. 66–67). Patient 5 was admitted with increasing troponin values, indicating "a heart attack or other heart damage." (*Id.* at p. 67; Doc. 34-8, ¶ 31; *see also* Doc. 34-2, 40:13–15). In the Leung Declaration, Leung states that Patient 5's presentation "classified [the patient] as having non-ST elevation myocardial infarction," a type of heart attack. (*Id.* ¶ 32). Thus, the general cardiologists wanted Patient 5 to undergo a heart cath and possible intervention. (*Id.* ¶ 33). After Patient 5 had a normal stress test, Plaintiff decided to defer any intervention. (*Id.* ¶ 34). However, Leung, along with another physician, Elona Rrapo, insisted that a heart cath be done. (*Id.*; Doc. 34-2, 38:5–20; Doc. 34-3, p. 85). The heart cath revealed severe blockages in one of the patient's coronary arteries, requiring placement of a stent. (Doc. 34-8, ¶ 35; Doc. 34-2, 38:21–24; Doc. 32-3, p. 88).

Finally, the next day, on May 13, 2022, Plaintiff performed a coronary imaging procedure on a patient ("**Patient 6**"). (Doc. 32-3, pp. 59–60). Plaintiff

unsuccessfully attempted three different access points before obtaining access using Patient 6's left radial artery. (*Id.*; Doc. 34-8, ¶ 27). Then, the cath lab staff called Leung for help, as the catheter was stuck in Patient 6's arm. (Doc. 34-8, ¶ 27). The catheter had kinked on itself and formed a loop, requiring the assistance of multiple physicians of different specialties to correct. (*Id.*; *see also* Doc. 34-3, pp. 59–60). In the Leung Declaration, Leung offers the unrebutted opinion that such "severe kinking of a catheter to the point that it gets trapped or stuck is uncommon and avoidable," because the physician receives warning signs of a problem before this occurs. (Doc. 34-8, ¶ 28).

### G.    The Third Suspension and Second Claim of Discrimination

The Second FPPE ended on May 24, 2022, and Plaintiff resumed her normal practice as an interventional cardiologist. (Doc. 33, ¶ 8). According to a Declaration by Dr. Lisa Zacher, the Chief of Staff for the Medical Center (the "**Chief of Staff**"), on July 21, 2022, the Medical Executive Committee ("**MEC**") discussed extending the Second FPPE for cause. (Doc. 34-6, ¶ 11). Yet, "MEC members voiced significant concerns for patient safety if [Plaintiff] continued to practice interventional cardiology procedures even while closely monitored." (*Id.*). Thus, three days later, on July 24, 2022, the Director issued a Letter again suspending Plaintiff's IC privileges (the "**Third Suspension**"). (Doc. 33, ¶ 9). Shortly thereafter, on August 11, 2022, the MEC voted to permanently reduce Plaintiff's IC privileges (the "**MEC Vote**"). (*Id.* ¶ 10).

Plaintiff avers in the Amended Complaint that, on November 18, 2022, she went to Milunski as her "immediate supervisor to complain about being subjected to a hostile work environment" but Milunski "became angry" and "failed to take prompt remedial action to cure the problem." (the "**Milunski Exchange**"). (Doc. 23, ¶ 11). At some point that same month, Plaintiff received her performance appraisal for her work at the Medical Center for the period from October 1, 2021, to September 30, 2022 (the "**Appraisal**").[6] (Doc. 33, ¶ 11). Therein, Milunski gave Plaintiff an overall rating of "satisfactory." (*Id.*). However, Milunski rated Plaintiff's clinical competence as "low satisfactory." (*Id.*). On November 30, 2022, Plaintiff contacted EEO counsel with ORMDI regarding the Appraisal (the "**Second Claim of Discrimination**"). (*Id.* ¶ 12). Plaintiff did not make a formal charge of discrimination with ORMDI as to this claim. (*Id.* ¶ 13).

## H. The Permanent Reduction of Privileges and Third Claim of Discrimination

About two months later, on February 2, 2023, Plaintiff received a letter from the Chief of Staff informing her that the Medical Center was considering permanently reducing her IC privileges. (*See id.* ¶ 14). On March 20, 2023, the Director issued a letter to Plaintiff confirming that he had decided to reduce these privileges. (*Id.* ¶ 15 (the "**Permanent Reduction**")). Plaintiff was afforded a hearing regarding this decision before a three-physician Fair Hearing Board. (*Id.*

---

[6]   While Defendant asserts the Milunski Exchange and Appraisal were part of the same conversation between Plaintiff and Milunski on November 18, 2022, the Court need not decide this issue to rule on the Motion. (Doc. 36, pp. 3–4).

¶¶ 16–17). On May 25, 2025, the Fair Hearing Board formally recommended a reduction of Plaintiff's IC privileges. (*See id.* ¶ 18). The Director accepted this recommendation and Plaintiff appealed. (*Id.* ¶¶ 19–20).

Soon thereafter, the Veterans Administration reported to the National Practitioner Data Bank that Plaintiff's privileges had been reduced. (*Id.* ¶ 22). Then, on June 14, 2023, the Veterans Integrated Service Networks (VISN) 8 Director agreed with the Fair Hearing Board's decision. (*Id.* ¶ 20). Six days later, Plaintiff contacted EEO counsel with ORMDI regarding the reduction in her privileges (the "**Third Claim of Discrimination**"). (*Id.* ¶ 23). Finally, on September 19, 2023, Plaintiff filed a formal charge of discrimination with ORMDI as to the Third Claim of Discrimination. (*Id.* ¶ 24). Plaintiff ultimately resigned from her employment with the Medical Center. (*Id.* ¶¶ 25–26).

As a result of the foregoing, Plaintiff sued Defendant for creating a retaliatory hostile work environment under Title VII. (Doc. 23). Although the Amended Complaint is not a model of clarity,[7] as best as the Court can glean,

---

[7]  Plaintiff makes contradictory claims regarding the timeline in the case in her filings. For example, in the Amended Complaint, Plaintiff alleges that she "initially engaged in protected activity on November 30, 2022," when she made the Second Claim of Discrimination. (Doc. 23, ¶ 11). However, in the Response, Plaintiff appears to identify the Formal Charge on January 18, 2022, as her first instance of protected activity. (*See* Doc. 35, p. 2). Similarly, in the Amended Complaint, Plaintiff states that "[s]even days *after* Plaintiff contacted [ORMDI] to complain about discrimination she was notified on December 6, 2021, that she was being placed on summary suspension . . . ." (Doc. 23, ¶ 13 (emphasis added)). Yet, Plaintiff has submitted an agreed upon timeline confirming that the letter informing Plaintiff of the Second Suspension came one day *before* this claim of discrimination was made. (Doc. 33, ¶¶ 5–6). Despite this lack of clarity, the Court will nevertheless attempt to discharge its duty to read the evidence and draw all factual inferences therefrom in the light most favorable to Plaintiff and to resolve any reasonable doubts in Plaintiff's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).

Plaintiff alleges that the retaliatory acts that form the basis of her claim are as follows: (1) Milunski yelling at Plaintiff during the Milunski Exchange; (2) Milunski's unfavorable Appraisal; and (3) the various suspensions of Plaintiff's IC privileges and Permanent Reduction in those privileges. (*See generally* Doc. 23).

In the Motion, Defendant contends it is entitled to final summary judgment because there is no genuine issue of material fact regarding Plaintiff's failure to: (1) exhaust her administrative remedies before filing suit; (2) establish a *prima facie* retaliatory hostile work environment claim, as she cannot demonstrate either a hostile work environment or the element of causation; and (3) demonstrate entitlement to monetary damages. (*See* Doc. 34).

## II.    LEGAL STANDARD

### A.    Summary Judgment

A court may only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. FED. R. CIV. P. 56(c)(1)(A). Alternatively, the movant may meet its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P.

56(c)(1)(B). "The burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop*, 485 F.3d at 1136. But, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (citations omitted)).

"The court need consider only the cited materials" when resolving a motion for summary judgment. FED. R. CIV. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam).[8]

---

[8] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

**B.    Retaliatory Hostile Work Environment**

Title VII's federal-sector provision, 42 U.S.C. § 2000e-16(a), provides that "[a]ll personnel actions affecting employees or applicants for employment . . . [in certain enumerated government positions] . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." This language also prohibits retaliation for an employee's engagement in protected activity. *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1203 (11th Cir. 2021).

A claim for retaliatory hostile work environment under Title VII "is somewhat of a hybrid of a traditional . . . hostile-work-environment claim and a traditional retaliation claim." *Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1356 (11th Cir. 2024) (quoting *Buckley v. Sec'y of the Army*, 97 F.4th 784, 799 (11th Cir. 2024)). Such claims are analyzed like retaliation claims and require a plaintiff to prove the plaintiff "engaged in protected EEO activity and suffered a hostile work environment because of that activity." *Id.* (citing *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)). The plaintiff must further establish that the environment was such that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

**III.    DISCUSSION**

The Court begins with Defendant's assertion that Plaintiff cannot establish a causal link between any protected activity and the alleged retaliation. (Doc. 34,

pp. 15–17, 21–24). Because the Court agrees with Defendant that there is no genuine issue of material fact as to the element of causation, the Court does not address Defendant's remaining arguments.

While "the causal link element for a *prima facie* case is construed broadly," a plaintiff must still show that "the protected activity and the negative employment action are not completely unrelated." *Curet v. Ulta Salon, Cosmetics & Fragrance, Inc.*, No. 23-12372, 2024 WL 2564166, at *3 (11th Cir. May 24, 2024) (quoting *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)).

"One way a plaintiff satisfies the causation requirement is by showing that the employer knew of the statutorily protected activity and that there was a close temporal proximity between the employer's awareness and the adverse action." *Jeter v. Roberts*, No. 22-13983, 2024 WL 507183, at *3 (11th Cir. Feb. 9, 2024) (citing *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)). However, "mere temporal proximity, without more, must be 'very close'" in order to establish causation. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Thus, "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *See id.* (citing *Breeden*, 532 U.S. at 273). "[T]he causation element of a *prima facie* case may still be established if a party present[s] evidence from which a reasonable jury could find that a causal connection existed between the protected activity and the adverse action." *Jeter*, 2024 WL 507183, at *3 (internal quotation omitted). However,

absent additional evidence supporting causation, such a delay causes the plaintiff's claim to fail as a matter of law. *Id.* (citing *Higdon*, 393 F.3d at 1220).

## A. Events Occurring before the Protected Activity

To begin, Defendant correctly notes that any events that occurred *before* Plaintiff's protected activity cannot be causally related to that activity and thus cannot form the basis for Plaintiff's claim. (*Id.* at p. 22); *Debe v. State Farm. Mut. Auto. Ins. Co.*, 860 F. App'x 637, 640 (11th Cir. 2021) ("[I]f the alleged retaliatory conduct occurred *before* the employee engaged in protected activity, the two events cannot be causally connected." (citations omitted)).

In the Response, Plaintiff asserts that she "first engaged in protected activity when she contacted [ORMDI] to complain about disparate treatment." (Doc. 35, p. 2 (citing Doc. 35-2)). It is not abundantly clear whether Plaintiff intends to refer to the First Claim of Discrimination on December 7, 2021, or the subsequent Formal Charge on January 18, 2022. (*See id.*; Doc. 33, ¶¶ 6–7). In either case, any actions preceding these events—including the First Suspension and Second Suspension—plainly cannot serve as the basis for Plaintiff's claim. (*See* Doc. 33, ¶¶ 3, 5–7); *Curet*, 2024 WL 2564166, at *3. Accordingly, the Court constrains its analysis to possible retaliatory events occurring after these dates.[9]

---

[9] Defendant offers in the Motion that Plaintiff may assert she was "micromanaged" by Leung and Milunski starting in 2020 and that such micromanagement was retaliatory. (Doc. 34, p. 17). Defendant notes that such ordinary tribulations in the workplace are not actionable under Title VII. (*Id.* at pp. 17–19 (collecting cases)); *see also Terrell*, 98 F.4th at 1356 ("The standards for judging hostility are intended to be 'sufficiently demanding to ensure that Title VII does not become a general civility code.'" (internal quotation omitted)). Further, Plaintiff does not discuss micromanagement in either her Amended Complaint or her Response. (Docs. 23, 35). In any event, the lone evidence provided as to this issue is in the portion of Plaintiff's

## B.    Events Occurring after the Protected Activity

Next, Defendant contends that the subsequent allegedly retaliatory events occurred months after Defendant learned of Plaintiff's EEO activity and that the "temporal gap is too large" to establish causation. (Doc. 34, pp. 22–23). Defendant also highlights the absence of additional evidence to support causation. (*Id.*). Defendant thus contends that there is no genuine issue of material fact as to this element and that it is entitled to judgment as a matter of law. (*Id.*). The Court will address each of the relevant events occurring after Plaintiff's first claim of protected activity along with any other possible evidence regarding causation.

### 1.    The Third Suspension and the MEC Vote

To begin, Defendant cites to the Director Declaration, wherein the Director affirms he first learned of Plaintiff's EEO activity on December 16, 2021," nine days after Plaintiff's First Claim of Discrimination.[10] (Doc. 34-15, ¶ 10; Doc. 33, ¶ 6). The Director further states that he had "the sole authority to suspend, revoke, or reduce" Plaintiff's privileges. (Doc. 34-15, ¶ 3). As Plaintiff does not dispute these

---

testimony cited by Defendant in the Motion, which confirms the purported micromanagement began in 2020—well before Plaintiff made the First Claim of Discrimination on December 7, 2021. (Doc. 34 (citing Doc. 34-2, 47:16-48:4, 50:16–51:23). Accordingly, while Plaintiff has seemingly abandoned any claim that such micromanagement was retaliatory, the Court nonetheless notes it lacks evidence to support the existence of a causal nexus between Plaintiff's protected activity and the purported micromanagement. (*See id.*).

[10]    The Court notes that the Motion states that the Director learned of Plaintiff's EEO activity on "December 16, *2022.*" (Doc. 34, p. 23). The Court presumes this is a result of a scrivener's error, as (1) Defendant cites to the Director's Declaration, wherein the Director states that he learned of Plaintiff's EEO activity on December 16, *2021,* and (2) Defendant utilizes this date to argue that events occurring in July and November of 2022 occurred more than three months *after* the Director learned of Plaintiff's protected activity, but December 2022 *follows* these dates. (Doc. 34-15, ¶ 10; Doc. 34, pp. 22–23).

assertions of fact in her Response, the Court deems them admitted. (Doc. 35); *see Aning v. Fed. Nat'l Mortg. Ass'n*, 663 F. App'x 773, 776 (11th Cir. 2016) (holding that a court may deem admitted facts that remain unrebutted in response to a motion for summary judgment).

Using the agreed upon timeline, the next possible retaliatory event was the Third Suspension, which occurred on July 24, 2022—more than seven months after the Director learned of Plaintiff's protected activity.[11] (Doc. 33, ¶ 9). This is double the temporal gap the Eleventh Circuit has found to be too remote to support causation absent additional evidence. *See Thomas*, 506 F.3d at 1364; *see also Breeden*, 532 U.S. at 273. The MEC Vote to permanently reduce Plaintiff's IC privileges on August 11, 2022, is even more remote. (Doc. 33, ¶ 10). Thus, absent additional evidence of causation, Defendant has discharged its initial burden under Rule 56 of demonstrating a lack of causal nexus between the protected activity and the Third Suspension and MEC Vote. *See* FED. R. CIV. P. 56(c)(1).

### 2.  *The Milunski Exchange*

The next relevant events in the case are the Milunski Exchange on November 18, 2022, and the Appraisal the same month. (Doc. 34, p. 16 (citing Doc. 23, ¶ 21)). As to the Milunski Exchange, in the Amended Complaint, Plaintiff avers that she "engaged in protected activity by speaking with her immediate supervisor, Dr. Mark Milunski, about what she perceived was a hostile work environment" and

---

[11]  In the intervening months, the Director restored Plaintiff's IC privileges, initially with monitoring, and later, in full. (Doc. 33, ¶¶ 4–5).

that, instead of taking "prompt and remedial action to correct the problems . . . .

he yelled at her as though she was the problem for complaining." (Doc. 23, ¶ 21).

Plaintiff alleges that she then "suffered reprisal" by "receiving a performance

evaluation that was lower than she earned." (*Id.* ¶ 12).

Defendant's argument regarding the Milunski Exchange and Appraisal is

twofold. First, Defendant asserts that Plaintiff's complaint to Milunski cannot

constitute an additional instance of protected activity, as "[i]t is undisputed that

Plaintiff did not explicitly or implicitly notify Milunski to unlawful discrimination."

(Doc. 34, p. 16). In support, Defendant cites the Milunski Declaration, wherein

Milunski states that "[Plaintiff] never told me anything to suggest she believed she

was being subjected to unlawful discrimination, retaliation, or a hostile work

environment."[12] (Doc. 34-12, ¶ 9).

"A complaint about an employment practice constitutes protected

opposition only if the individual explicitly or implicitly communicates a belief that

the practice constitutes unlawful employment discrimination." *Murphy v. City of

Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (internal citations omitted).

Relatedly, a plaintiff's failure to demonstrate the relevant decisionmaker is aware

of a complaint of unlawful activity disrupts the chain of causation as to any alleged

retaliation. "After all, a 'decision maker cannot have been motivated to retaliate by

---

[12]    While Defendant also attempts to support its argument by quoting Plaintiff's deposition
testimony, Defendant's exhibit in support of this quotation appears to be missing the relevant
page. (Doc. 34, p. 16; *see* Doc. 34-2). In any event, the Court considers the same testimony in
the context of Defendant's Reply *infra*, as the testimony was properly attached to that filing.

something unknown to him . . . .'" *Martin v. Fin. Asset Mgmt. Sys.*, 959 F.3d 1048, 1054 (11th Cir. 2020) (quoting *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)). Defendant has thus met its burden of citing evidence to support that Plaintiff did not engage in protected activity during the Milunski Exchange. *See* FED. R. CIV. P. 56(c)(1). Thus, the burden shifts to Plaintiff to point to evidence demonstrating the existence of a material fact on this issue. *See Porter*, 461 F.3d at 1320.

In the Response, Plaintiff does not directly engage with Defendant's argument. (*See* Doc. 35). However, Plaintiff does state in the facts section of the Response that she "went to her manager on November 18, 2022, *to complain about a hostile work environment* [and] the Chief, Dr. Milunski, became angry and yelled at her." (*Id.* at p. 2 (citing Doc. 35-2) (emphasis added)). In support, Plaintiff cites to an interrogatory response that was given by Plaintiff in the case. (*Id.* (citing Doc. 35-2)). However, as Defendant notes in its Reply, the attached interrogatory responses are unexecuted. (Doc. 35-2, p. 5; Doc. 36, p. 3). Accordingly, the Court may not consider this evidence in its analysis. *See Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) ("Unsworn statements 'do[ ] not meet the requirements of Fed. Rule Civ. Proc. 56(e)' and cannot be considered by a district court in ruling on a summary judgment motion." (internal citation omitted)). Defendant also attaches to its Reply Plaintiff's deposition testimony regarding what she communicated to Milunski during the Milunski Exchange, wherein Plaintiff states "I just said I don't feel comfortable." (Doc. 36-1, 12:7–10). Under

the circumstances, Plaintiff has not met her burden of demonstrating an issue of material fact, and the Court finds Plaintiff did not engage in protected activity during the Milunski Exchange as a matter of law. *See Porter*, 461 F.3d at 1320.

Second, Defendant argues that the Milunski Exchange and Appraisal are too remote from the first instance of protected activity to constitute retaliation for that activity. (Doc. 34, pp. 22–23). Considering that these events happened roughly eleven months after Plaintiff's First Claim of Discrimination, Formal Charge, and the Director's knowledge of that activity, Defendant has met its initial burden under Rule 56(c)(1)(A) of demonstrating the lack of a causal nexus between the protected activity and these events, at least in the absence of other evidence of causation. *Thomas*, 506 F.3d at 1364.

### 3.    *The Permanent Reduction*

In the next events of relevance, on November 30, 2022, Plaintiff made the Second Claim of Discrimination regarding the Appraisal. (Doc. 33, ¶ 12). Then, on March 20, 2023—nearly four months later—the Director sent a letter to Plaintiff informing her of the Permanent Reduction of privileges. (*Id.* ¶ 15). Again, Defendant has met its burden of establishing the temporal gap between the protected activity and Plaintiff's Permanent Reduction of privileges is too large to support causation, absent other supportive evidence.[13]  (Doc. 34, pp. 22–23).

---

[13]    Although Defendant disputes that the Second Claim of Discrimination qualifies as protected activity, the Court assumes, *arguendo*, that it does. (Doc. 34, pp. 15–16). Further, considering Plaintiff resigned after the Third Complaint of Discrimination, the Court does not assess the possibility of retaliation based upon this complaint. (Doc. 33, ¶¶ 23–26).

    *4.     Plaintiff's Sole Reference to a Relevant Temporal Gap*

Notably, Plaintiff does not directly grapple with Defendant's temporal gap causation argument. (Doc. 35). However, Plaintiff does include a relevant sentence in the facts section of her Response, wherein Plaintiff states that "[f]ive days after the Plaintiff contacted [ORMDI regarding the Appraisal], she was placed on a summary suspension." (*Id.* at p. 2 (citing Doc. 35-5, p. 2)). In support, Plaintiff cites to the second page of an investigative summary regarding Plaintiff's Second Claim of Discrimination. However, the Court can find nothing on this page to support Plaintiff's assertion. (*See* Doc. 35-5, p. 2). Indeed, this assertion is belied by the agreed upon timeline submitted by the parties. (*See* Doc. 33). Plaintiff has thus failed to meet her burden of "present[ing] affirmative evidence to show that a genuine issue of material fact exists" as to Defendant's temporal gap causation argument. *See Porter*, 461 F.3d at 1320; FED. R. CIV. P. 56(c)(3) (confirming that "[t]he court need consider only the cited materials" when resolving a motion for summary judgment); *see also HRCC, LTD*, 703 F. App'x at 816–17.

**C.    Other Possible Evidence of Causation**

Finally, in the Motion, Defendant anticipates that Plaintiff may attempt to support causation by asserting interventionalists Leung and Dr. Roshan Patel ("**Patel**") who "did not engage in protected activity were treated more favorably" than Plaintiff. (Doc. 34, p. 23). However, Defendant points to the absence of evidence demonstrating the other providers are similarly situated to Plaintiff. (*Id.* (citing *Lewis v. City of Union City*, 918 F.3d 1213, 1227 (11th Cir. 2019))).

Defendant contends that Plaintiff cannot point to evidence demonstrating (1) that these providers were involved in similar patient events to Plaintiff with regard to Patients 1, 2, 3, 4, 5, and 6; (2) that these providers *did not* engage in protected activity; or (3) that Defendant's leadership was aware of such circumstances and treated Plaintiff and these providers differently. (*Id.* at pp. 23–24). Defendant has thus met its burden of citing to the absence of evidence to support such an argument and the burden shifts to Plaintiff to establish an issue of material fact. *See* FED. R. CIV. P. 56(c)(1)(B).

In the Response, Plaintiff asserts that Defendant's "rationale for suspending the Plaintiff and for permanently reducing her privileges, applied equally, to Dr. Leung and Dr. Patel." (Doc. 35, p. 12). Plaintiff cites that Leung cared for Patient 3 but was not blamed for the death. (*Id.* at pp. 2–4). Plaintiff further cites to Leung's deposition testimony that he has had at least one other patient die following a medical procedure, but he was not suspended. (Doc. 35-7, 27:11–16, 28:2–3, 28:21–22). By contrast, Plaintiff asserts—without citing to any record evidence— that "[p]rior to [the] incident [with Patient 3], the Plaintiff never had a patient who died." (Doc. 35, p. 4). Plaintiff further cites Leung's testimony that, sometime in 2022, Patel had a patient die after the patient moved during a procedure involving a guidewire, but he was not suspended. (Doc. 35-7, 42:1–17, 47:5–7). Finally, Plaintiff cites evidence that Patel reviewed the events involving Patient 3 and did

not believe Plaintiff had "departed from the normal practice of other interventional cardiologists" in that case.[14] (Doc. 35-8, 17:11–18).

There are critical gaps in Plaintiff's argument regarding the other providers that foreclose its success. To begin, though Plaintiff's task is to show that her protected activity caused the purported retaliation, Plaintiff's argument is devoid of any reference to whether Leung or Patel have ever engaged in such activity. *E.g.*, *Terrell*, 98 F.4th at 1356; (*see* Doc. 35). Further, while Plaintiff has provided evidence that Leung and Patel have suffered one or more bad patient outcomes, she has provided no evidence that Defendant was concerned about these providers' *clinical competency*. (*See* Doc. 35). Nor has Plaintiff provided sufficient detail regarding the deaths to allow the Court to infer that Defendant *should have* been so concerned. (*See id.*). Surely, it is inevitable that physicians performing cardiac procedures will have patients suffer bad outcomes from time to time. While it is possible that Leung or Patel committed medical errors that contributed to their patients' deaths, Plaintiff has not adduced any evidence to support such a possibility. (*See id.*).

By contrast, Defendant has provided evidence that the suspensions of and permanent reduction of Plaintiff's IC privileges were not the result of bad outcomes *alone* but were instead the result of Defendant's concerns regarding Plaintiff's clinical competency. *See* discussion *infra* Section I. Indeed, while Plaintiff

---

[14] While Plaintiff references that the case involving Patient 3 was peer-reviewed by an additional interventional cardiologist in California, Plaintiff provides no citations to support her assertion. (Doc. 35, p. 5). Thus, it is entitled to no weight here. *See Porter*, 461 F.3d at 1320.

challenges the events underlying Patient 3's death, Plaintiff's Response does not broach the events involving Patients 1, 2, 4, 5, or 6. (*See* Doc. 35). Importantly, at least two of these patient events—the events involving Patients 1 and 6—involve unrebutted evidence that Plaintiff committed preventable errors that caused patients harm. While the Court does not intend to disparage Plaintiff or her skill, these facts establish material differences between Plaintiff's circumstances and those of the other providers.

Further, to the extent Plaintiff proffers Patel's opinion that Plaintiff provided adequate care to Patient 3, Plaintiff fails to provide when Patel conveyed that opinion or to whom. Importantly, Plaintiff does not state that this opinion was conveyed to any member of Defendant's leadership before they suspended or permanently reduced her privileges. The issue at hand is whether Plaintiff can cite evidence to support that Defendant acted with retaliatory intent in making these decisions. One provider's opinion that Plaintiff provided adequate care as to one of the six cited patient events, at most, raises a "metaphysical doubt" as to that issue. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Put differently, this opinion, standing alone, would not allow a jury to reasonably find for Plaintiff on the element of causation. *See Jeter*, 2024 WL 507183, at *3. Thus, Plaintiff has not met her burden to demonstrate there exists a genuine issue of material fact as to the element of causation and Defendant is entitled to judgment as a matter of law. *See Porter*, 461 F.3d at 1320.

## IV.   CONCLUSION

As a result of the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1.     Defendant's Motion for Summary Judgment (Doc. 34) is **GRANTED**.

2.     The Clerk of Court is **DIRECTED** to terminate any pending motions
and thereafter close the file.

**DONE AND ORDERED** in Orlando, Florida on January 9, 2026.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties